NEW YORK OYER AND TERMINER.

September, 1848.

Before EDMONDS, Justice, and two Aldermen.

## THE PEOPLE v. THOMAS HAYES.

Challenge to jurors. One who has read in a newspaper an account of the transaction, which he believes, is not thereby disqualified from serving on the jury, if he can, notwithstanding, find a verdict according to the evidence.

No opinion formed from reading a newspaper account of the transaction will disqualify the juror, unless it is such a settled opinion that he could not disregard what he has read out of court, and render his verdict on the evidence alone.

Where the act which caused the death was dangerous to the deceased alone, it would constitute murder if it was imminently dangerous to the deceased, and evinced a depraved mind, regardless of human life, although without any premeditated design to effect the death of any one.

THE prisoner was indicted for the murder of his wife. On impaneling the jury one of them was challenged to the favor by the prisoner's counsel, on the ground that he had formed an opinion, and it was agreed that the challenge should be tried by the court. On being sworn he testified that he had read an account of the transaction in the newspapers, but had formed no opinion as to the guilt or innocence of the prisoner. He was then asked, "Did you believe the account that you read to be true?" and answered, "I believed what I read. I had no reason to disbelieve the statement." "Has any thing since transpired to change your belief on the subject?" "No, sir." On being cross-examined by the district attorney, he said that notwithstanding what he had read, he could find a verdict according to the evidence.

*J. M. Smith, Jr.*, for the prisoner, insisted that the juror was disqualified; that his mind was not entirely free from bias. And in the language of MARCY, J., in *The People* v. *Mather* (4 Wend. 244), the disqualifying bias which the law regards is

one which, in a measure, operates unconsciously on the jury-man, and leads him to indulge his feelings when he thinks he is influenced entirely by the weight of evidence. If he is sincerely determined to discard his prejudices, he is not to be received, because the law does not hold him capable of doing so. He will listen with more favor to that testimony which confirms than to that which would change his opinion.

*McKeon*, district attorney, referred to *People* v. *Honeyman* (3 Denio, 122).

*Edmonds*, *J.*, in delivering the decision of the court on the challenge, said he was glad that this question had been submitted to the court rather than to triers, as it would enable them to lay down a rule on this much vexed question, which would serve for a guide in this and other cases.

The doctrine as to what bias would disqualify a juror, as recently understood, had worked very disastrously on the administration of public justice. In one case (that of Mary Bodine) over 6,000 jurors had been summoned, and more than 4,000 had been examined on challenges to the favor and set aside on account of bias. That bias was nothing more than having read a newspaper account of a former trial, and on that formed an opinion or imbibed an impression. The effect had been to allow hundreds to swear themselves out of the jury box, in order to avoid the burden of the jury duty in that case, and there was good reason to believe that very many, in order to disqualify themselves, had taken pains to read the case and express an opinion, in order to produce that result. And even where that was not the case, the stringency of the rule excluded from the jury men of reading and intelligence, and drove the court to seek for its aid in the administration of justice only among the ignorant and uninformed. These evils, operating in a community where people are so much engaged in business, and where almost every one who can read does read the daily papers, were of an alarming nature, inasmuch as it afforded to the real criminal, one whose

guilt has been attended with features of peculiar atrocity, an additional and unmerited chance of escape.

These evils had arisen, not so much from the application of the rule which the court made in the case of *Bodine* as from the sanction there given to the ruling in the case of *Mather*. That case grew out of the anti-masonic excitement which raged with such violence in the western part of the State. A juror challenged for principal cause testified that he had no fixed opinion as to the defendant's guilt, other than such impressions as are formed on history and common reports. He referred to printed statements in the newspapers, never having had any information from persons acquainted with the transaction. If the evidence should support the circumstances he had heard, he had a fixed belief as to guilt, if they should not be proved, his belief would be removed. The challenge for principal cause was sustained, and the juror set aside. On exceptions by the public prosecutor, the Supreme Court sustained the ruling below, and in doing so used the language quoted by the prisoner's counsel here, and they went further and ruled that they who believe on the slightest evidence, or no evidence at all, were more disqualified than a grand juror who had patiently listened to all the evidence on which an indictment was found, or one who had witnessed the commission of the offense.

The bias, in this regard, that disqualifies, is the having a fixed and definite opinion. When that exists it is a ground for principal challenge, and is to be passed upon by the court. An opinion or belief short of that is not a ground for principal challenge, but to the favor, when it becomes a question of fact for the triers to determine. Is there no rule of law to guide the triers in the discharge of this duty? Is it not the duty of the presiding judge, in submitting the case to them, to furnish them some light to their path? Or must he sit supinely by and suffer them to run wild with some such impossible idea as that the mind of the juror must be, in respect to the case in hand, "like a blank piece of paper," or be governed by some such unintelligible maxim as this, that the

juror "must stand indifferent as he stands unsworn?" Or must he be an indifferent spectator to the scene of hundreds of jurors discharging themselves from a disagreeable duty, and feel himself powerless to arrest so grievous an evil? He had not, in the *Bodine case*, so understood the duty of a presiding judge. When, therefore, he submitted the question to the triers, he advised them not to reject a juror unless he had a fixed and definite opinion, which it would require evidence to remove. In this he was held to have erred, and when a juror under examination had stated that he had formed no opinion, he excluded the inquiry whether what he had read had made any impression on his mind, or had produced any belief there, for two reasons — first, because it was converting a direct into a cross-examination, and next, because it was immaterial whether it had or not, and he had always understood it to be a rule not to admit testimony which the court would afterward be bound to instruct a jury to disregard. In this also he was held to have erred, and it was distinctly announced that every question might be asked which tended to show the state of the juror's mind.

When he afterward came to apply the rule thus laid down, he found the court placed in this position:

He who had formed an opinion as to the guilt or innocence of the prisoner was excluded from the jury;

As was he who had formed an opinion as to the truth or falsehood of any of the facts which went to establish the guilt or innocence, for it was so held by Chief Justice MARSHALL in *Burr's case;*

He who had formed such opinion from a personal knowledge of the facts;

Or like the grand juror or committing magistrate, from hearing an *ex parte* statement by the witnesses, though in the absence of cross-examination or defense;

Or like the great mass of the reading public, from newspaper reports, the truth or falsehood of which they could not know, and did not inquire into, were alike excluded, and were not to be trusted, with the effort to decide according to the

evidence, because, in the language of the *Mather case,* "the law held them incapable of doing so."

And the juror. himself might be examined, though he by his evidence proclaimed his own infamy, in prejudging a fellow creature in a matter of life and death, upon a mere newspaper report.

And in his examination any question might be asked him which tended to show the state of his mind, even though he had already declared that he had formed no opinion in the matter.

Under such circumstances he could discover nothing that was left for the court but to give to the triers the vague and indefinite advice not to reject a juror for slight causes.

This, it was immediately apparent, was not enough to prevent the designing from relieving themselves from an unpleasant task, or to prevent the exclusion from the jury box of almost every juror of intelligence, information, and character.

He rejoiced, however, now to perceive that better views were taken of this question, and that the decision of the Supreme Court, in the cases of *Mather* and *Bodine,* were "misunderstood."

In the case of *Bodine* (1 Denio, 285), he charged the triers that "in order to form such opinion as disqualifies, two things are necessary — a belief in the truth of the facts upon which the opinion is founded, and a conclusion founded on such belief. There are two questions: first, has the juror now an opinion as to the truth of the facts he has read or heard?—second, has he an opinion as to the guilt or innocence of the prisoner? A mere faint impression, founded on either personal knowledge of the circumstances, or on a relation of them by those who have such knowledge, or a mere rumor, or report, is not such an opinion as disqualifies. It must be a fixed and decided opinion, such as it will require evidence to remove."

The court (1 Denio, 308) held that in this there was error; "that a fixed and absolute opinion may be necessary to sustain a challenge for principal cause, but not so where the

challenge is for favor, and that the inquiry should by no means be limited to the isolated question of a fixed and absolute opinion."

In the case of *Honeyman* (3 Denio, 124) the court now say: "If, for example, the juror has heard, or has read in a news-paper, that the prisoner is guilty of the crime laid to his charge, and has given credit to the statement, the evidence of those facts must be received, and the triers must not be instructed as matter of law that they are not at liberty to reject the juror. Still it would not be a wise or judicious act on their part to set aside the juror, unless they found that he had such a settled opinion concerning the prisoner's guilt that he could not disregard what he had read and heard out of court, and render his verdict on the evidence alone. Intelligent and right minded men, when they enter the jury box, know how to lay aside what they have heard and read out of court, and pronounce their verdict upon the evidence, and upon that alone."

This, as he understood it, was bringing the matter back nearly to its original position, and virtually overruling much of the ruling in the *Mather case*, and henceforth it would be the duty of the presiding judge to charge the triers that they ought not to set aside a juror unless he has such a settled opinion that he cannot disregard what he has read and heard out of court, and render his verdict on the evidence alone, and that he is to be trusted when he says he can lay aside what he has thus read and heard, and pronounce his verdict upon the evidence, and that alone.

How far this differed from the ruling at the Circuit, in the *Bodine case*, it was unnecessary to stop to inquire. It was enough for the present question that it clearly called upon them to say that the juror now challenged was indifferent, and the challenge was overruled.

It appeared in evidence that the prisoner and his wife had not lived together for several years, but that they had been reunited for about a year before her death. He was a laboring

The People v. Thomas Hayes.

man, and occasionally indulged in the use of ardent spirits. On the evening on which she was slain, he was under the influence of liquor, and, as was his custom in such cases, he lay down on the floor to sleep. She awoke him for the purpose of getting him to undress and go to bed. What further occurred between them was unknown, except that he seized a cooper's ax, which she had used for splitting wood, and with it inflicted upon her five wounds, three of which were mortal, and one of which must have caused instant death.

*Smith*, of counsel for the prisoner, insisted that there was no premeditated design to effect her death, and that the prisoner was guilty of manslaughter only.

*Edmonds, J.*, charged the jury that if the killing, which was admitted, was perpetrated from a premeditated design to effect the death of the deceased, or by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of any one, it was murder.

The jury found the prisoner guilty of murder.

[NOTE.—Exceptions were taken to the ruling of the judge as to the challenge to the juror, and to the charge to the jury as above stated, and a writ of error was allowed, but the exceptions were abandoned.]